UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FLOYD BADEAUX                                          CIVIL ACTION

VERSUS                                                 NO. 10-2697

MAGNOLIA FLEET, L.L.C., ET AL.                         SECTION  "I" (3)

ORDER

On December 16, 2010, this Court conducted a bench trial in the above-captioned matter as to the sole issue of whether plaintiff, Floyd Badeaux, is entitled to maintenance and cure.  Thomas Discon and Frank D'Amico, Jr. were present on behalf of plaintiff, and Salvador Pusateri and Aaron Greenbaum were present on behalf of defendant Magnolia Fleet, L.L.C. ("Magnolia Fleet" or "defendant").  Following the day-long bench trial, the Court ordered supplemental briefing no later than December 30, 2010.  Both parties filed supplemental post-trial memoranda.  Having reviewed the testimony, the pre-trial memoranda, the post-trial memoranda, the evidence and the parties' arguments, the Court rules as follows.

I.      Procedural Background

On August 11, 2010, plaintiff sued Magnolia Fleet under the general maritime law, alleging that he suffered injuries to his back, neck, spine, ribs, arm and mind when he fell between a deck barge and the M/V Lockmaster ("the Lockmaster" or "the vessel") while attempting to board the latter vessel.  Plaintiff alleges that the vessel was unseaworthy.  Plaintiff seeks maintenance and cure

and general damages in the amount of $4,000,000.

On November 4, 2010, the parties consented to proceed before the undersigned as to the issue of maintenance and cure.  As noted above, on December 16, 2010, the undersigned conducted a bench trial.  Plaintiff, his wife and his son testified on plaintiff's behalf.  Daniel Weidner, defendant's president, John Stewart, defendant's vice-president, John Dufrene, another captain of the Lockmaster, and Jeffrey Ricketts, a deck hand, testified on defendant's behalf.  The parties introduced into the record the depositions of Dr. Lucien Miranne, Dr. Christopher Cenac, Dr. Joseph Uddo, Dr. Paul Hubbell and nurses Beth Zeringue and Gordon Simpson.  After the one-day bench trial, the Court took the matter under advisement.

## II.    Findings of Fact

Plaintiff has an unlimited Master's license with numerous years of experience as a captain on the Mississippi River and other inland rivers.  Plaintiff owned and operated his own maritime company until 1989.  He had never suffered an injury at a place of employment before working for Glen Woods.  While working for Glen Woods, plaintiff descended to the engine room of a vessel one night, where he asked the deck hands to ascend to the galley.  After a discussion in the galley, plaintiff turned to return downstairs.  He then slipped on oil on the floor and fell, resulting in a ruptured disc in his neck.  Plaintiff went to East Jefferson Hospital and eventually saw Dr. Lucien Miranne for treatment.  Dr. Miranne recommend a fusion.  Plaintiff underwent an anterior cervical fusion at C4-5 approximately six months after the accident in 1991.  (Dep. of Dr. Lucien Miranne at p. 7).  Plaintiff fully recovered from the surgery.  (*Id.*).

Plaintiff returned to work as a captain in mid-1994 with a full release from Dr. Miranne. Plaintiff was performing his duties on a motor vessel dispatcher when he again slipped and fell.  A

deck hand had squirted oil on a bunch of ratchets, and plaintiff slipped on the oil.  Plaintiff saw Dr. Miranne, who again recommended a fusion.  In 1994, plaintiff underwent an anterior cervical fusion at C6-7.  (*Id.*).  Plaintiff recovered after the fusion, and Dr. Miranne released him to work with no restrictions.  (*Id.*).  In 1995, plaintiff returned to work.

Plaintiff worked outside of the maritime industry for approximately the next 12 years.  In 2007, plaintiff re-instated his master's license.  In connection with the license re-instatement, plaintiff underwent a Coast Guard physical, which he passed.  Plaintiff returned to work for Marquette Transportation Company ("Marquette").  As is typical in the maritime industry, Marquette sent plaintiff to undergo a physical, which he passed.  Plaintiff stated that he has always informed the companies of his previous surgeries. Plaintiff suffered no accidents or injuries at Marquette.

In March 2010, plaintiff transferred to Magnolia Fleet where he worked as a trip pilot. Plaintiff testified that he advised Magnolia Fleet of his two previous surgeries.  In mid-April 2010, plaintiff began working as a captain on the Lockmaster.  Both plaintiff's wife, Barbara Badeaux, and his son, Brach Badeaux, testified that plaintiff suffered no neck or back pain before May 1, 2010.

On May 1, 2010, plaintiff reported to work at approximately 4:00 a.m.   Plaintiff met the relief captain, Joey Dufrene, on the levee, with whom he had a short conversation.  Plaintiff put on his life jacket and had on all his personal protective gear.  Plaintiff mounted the deck barge to board the Lockmaster.  There was a three-foot gap between the deck barge and the Lockmaster.   When plaintiff reached out to grab the step rail of the Lockmaster, the vessel dipped approximately a foot and a half.  Plaintiff missed the rung and fell into the river, striking the boat while falling.  Plaintiff fell into the river between the bow of the Lockmaster and the stern of the barge.   The last thing that

plaintiff remembers is that he lost his balance.

When he woke in the water, plaintiff thought that he was drowning.  Plaintiff reached the surface, his ribs stabbing him in the lungs, and he dipped below the surface of the water numerous times.  Plaintiff was eventually able to grab a rub rail.  Plaintiff eased around the front of the push knee, letting the current ease him down past the quarter bit while he held on to the rub rail.  Plaintiff placed his steel-toed boats against the keel coolers and used them as a step.  Plaintiff got out of the water, hollering, but no one came.  He had difficulty breathing.  He went to the restroom where he realized that blood was flowing from a small cut on the left side of his head and the skin had been scraped off his left arm, which was bleeding.

A deck hand named Trevor then found him.  Trevor helped to bandage plaintiff's arm. Plaintiff tried to call Daniel Weidner, President of Magnolia Fleet, from the office with Trevor's cell phone since his cell phone and the company phone had fallen into the water.  He failed to reached anyone.  Plaintiff ultimately left a message that he had been hurt and called his wife.  Plaintiff saw his son Brach on the levee as he was leaving, told him what had happened and sent him back to the boat to see Trevor.  His wife transported him to West Jefferson Hospital ("West Jefferson").

At West Jefferson, plaintiff complained that his side hurt, his head hurt, and that his arm was "busted."  (Defs.' Ex. 1).  Plaintiff did not complain about his back or neck.  (*Id.*). Plaintiff was diagnosed with one non-displaced fractured rib, a forearm contusion, and a head abrasion, which the treating physician described as mild.  (*Id.*).  Plaintiff had full range of motion in his neck and no tenderness in either his neck or his back.  (*Id.*).  Plaintiff's abdomen was soft with no evidence of tenderness.  (*Id.*).  He had no blurred vision, headaches, numbness, tingling or weakness.  (*Id.*).

4

Plaintiff appeared in no acute pain, symptoms were mild, and he appeared "comfortable."  (Id.).[1]
At West Jefferson, plaintiff refused all pain medication.  West Jefferson did not test plaintiff for
alcohol or drugs even though a Coast Guard regulation so requires.  Magnolia Fleet ultimately paid
for the visit to West Jefferson in full.

Plaintiff had not yet spoken with anyone from Magnolia Fleet.  The doctor told him that he
would have to stay at home for six to seven weeks.  Plaintiff told him that that was not possible. He
informed the doctor that he was returning home, that he would take a couple of Tylenol, and that he
would then dress and return to work, which he did.  Plaintiff also wrapped a brace around his chest
with the help of his wife.  Plaintiff wore the brace for months and asked anyone that he could to help
him tighten the brace.

Later, plaintiff finally spoke to Weidner and told him what had happened.[2]  Plaintiff told
Weidner that he would return to work.  Because the Lockmaster was on stand-by and on light duty,
Wiedner and plaintiff agreed that plaintiff could return to the vessel.  Plaintiff informed Weidner that
he "would work through the situation" with his ribs.  Plaintiff testified that Weidner did not offer
to send him to a hospital nor did he order plaintiff to fill out an accident report.  Plaintiff did not fill
out an accident report even though the captain of the vessel is responsible for entering an accident

_____

[1]     Plaintiff disputed the description of his diagnosis in the medical records from West
Jefferson.  Plaintiff disagreed with the diagnosis that he had no blurred vision, no
confusion or headaches, no numbness, tingling, weakness, no laborious breathing and no
loss of consciousness.  Plaintiff disagreed that the examiner checked his neck at West
Jefferson.  Plaintiff disagreed that he suffered no acute distress and that he was alert,
awake, and comfortable.  The Court can not, however, reject the objective medical
evidence in the West Jefferson medical records.  There was no evidence introduced at
trial that anyone falsified the medical records.

[2]     No party could remember the exact time that plaintiff finally reached Weidner by
telephone.

into the vessel's logbook.  (Defs.' Ex. 2 at p. 3).

After the May 1, 2010 incident, plaintiff continued to work at Magnolia Fleet for approximately two weeks.  Plaintiff never asked for a day off and never asked Weidner or John Stewart, Vice President of Magnolia Fleet,  to send him to a doctor.  Magnolia Fleet never performed a drug test after the accident, nor did they require a release from a doctor before plaintiff returned to work.  Because plaintiff never complained of pain after the accident, Weidner and Stewart took him at his word that he was fine.

A couple of days after the accident, plaintiff felt a tingling sensation in his hands and experienced pain running down his shoulder and arms.  His right foot and then his right leg experienced the tingling sensation and pain.  Plaintiff suffered with rib pain for approximately six months, and the pain eventually radiated to his left leg and foot.  Plaintiff never complained to Weidner or Stewart of any pain during the next 12 days of his employment at Magnolia Fleet.  In addition, plaintiff was able to complete his job duties on the Lockmaster during his final 12 days of employment.

As noted above, there is no mention of plaintiff's accident in the May 1, 2010 Lockmaster logbook.  There are no reports of any difficulty on plaintiff's part in operating the Lockmaster on May 2 or 3, 2010, nor are there any reports of pain in any of the logbooks.  Plaintiff candidly admitted that there is no written documentation that he informed anyone at Magnolia Fleet of his accident or his pain.  Had plaintiff reported any pain, both Weidner and Stewart testified that they would have sent him to see a physician.  Weidner and Stewart also testified that there was  no reason for plaintiff not to complain about any pain that he may have been experiencing.

On May 4, 2010, Weidner and Stewart visited the Lockmaster at Pontchartrain Materials

while plaintiff and his crew were on board. Stewart boarded the Lockmaster for approximately an hour to check on the crew and to inspect the boat.  Plaintiff  reported to Stewart on that day about his accident and showed him his abrasions and the brace.  Weidner remained on shore, from where he called plaintiff on the Lockmaster.  Weidner was approximately 50 to 60 yards away from plaintiff, who stood on the deck of the Lockmaster and faced Weidner on shore.  Stewart was in the wheelhouse, approximately three to four feet from plaintiff.  There were no obstructions between Weidner or Stewart and plaintiff.   From the vessel, plaintiff made a "double strong arm" gesture to Weidner.  Plaintiff admitted that Weidner and he had a habit of communicating through the "double strong arm" gesture.  Both Weidner and Stewart testified that the "double strong arm" gesture made them think that plaintiff was in "good working order" and that it was "business as usual."

During the hearing, plaintiff admitted that an incident had occurred on April 10, 2010 during his employment at Magnolia Fleet when he was the captain of the vessel The Creole Sun.[3]  On that date, the Creole Sun was ordered to bring the Kirby 29307 to Stolthaven, Braithwaite.  (Def.'s Ex. 10).  When plaintiff and the Creole Sun arrived at the Kirby fleet, there was only one barge at the pier.  (*Id.*).  Plaintiff picked up the barge and transported it to Stolthaven before he realized that he had picked up the wrong barge.  (*Id.*).  The Creole Sun then departed the Stolthaven dock with the wrong vessel, and the M/V Medina departed the first dock with the correct vessel, the Kirby 29307.  (*Id.*).  The two boats met, swapped out the vessels and returned to their respective docks.

Plaintiff was informed of the severity of the incident.  Plaintiff freely admitted that such an incident can put a company out of business. For example, loading the wrong chemicals into the wrong barge can have disastrous consequences.  Plaintiff admitted that the incident should not have

---

[3]        Before this incident, plaintiff had earlier torn a shore wire on the Creole Sun.

happened, was a serious error on his part and that a captain could be fired for such an infraction. Weidner testified that he should have fired plaintiff on that day but because Magnolia Fleet had originally hired plaintiff to be the captain of the Lockmaster, he decided to transfer plaintiff to that vessel instead and off the Creole Sun.   There was then a meeting to address the incident, attended by plaintiff, his crew,  John Stewart and a port captain for Kirby.  They discussed the severity of picking up the wrong barge.  After the meeting, plaintiff never heard about the incident again, and no one formally reprimanded him for the incident.

There were further concerns, however, with plaintiff's tenure on the Lockmaster.  Plaintiff and his crew were to paint the Lockmaster the colors of Magnolia Fleet, but the painting was not getting done.  Plaintiff and his crew were also not following Coast Guard regulations.  The crew was not to dispose of toiler paper in the commode, and there was a sign on the commode to this effect. Plaintiff and his crew removed the sign, however, and threw it away.  The crew had also removed many items from the kitchen to the wheelhouse.  For safety reasons, however, these items were to remain in the kitchen.

Weidner "drew the line" after learning of the infractions on the Lockmaster.  On or about May 13, 2010, plaintiff had a phone conversation with Weidner during which Weidner informed him that his services were no longer needed and that the company and plaintiff would have to part ways. Weidner informed him that "the situation was not working out," and he fired plaintiff, his brother and two or three other deck hands.   That is the last time that plaintiff spoke to Weidner.  Plaintiff testified that no one at Magnolia Fleet ever informed him of the reason for which it fired him. Weidner testified that he listed to plaintiff the three infractions as the reasons for terminating his employment.  Plaintiff became hostile after Weidner fired him and threatened reprisals.  Plaintiff

never sought maintenance and cure from Magnolia Fleet before or after it fired him even though he was familiar with the remedy as he had received it twice during the 1990s.

After Magnolia Fleet fired him, plaintiff sought re-employment with Marquette, who sent him to Industrial Medicine Specialists ("IMS") on May 20, 2010 for a physical.   The registered nurse, Beth Zeringue, first performed a physical examination of plaintiff.  Plaintiff informed Zeringue that he had no problems with range of motion in his neck, head, shoulders, and arms and that he had no phyiscal restrictions.  (*Id.* at 17).  Zeringue noticed no problems with the range of motion in his neck and no problem bending his back at the waist.  (Dep. of Beth Zeringue at pp. 18, 26).  Plaintiff exhibited no signs of hernia bulging, and Zeringue ordered plaintiff to lie on his back and perform a sit-up.  (*Id.* at pp. 24-27).  Plaintiff did not report – and Zeringue did not note – any loss of sensation in plaintiff's extremities, and his reflexes were  good.  (*Id.* at p. 34).  Plaintiff did not inform Zeringue of the May 1, 2010 accident.  (*Id.* at p. 19).  Zeringue cleared plaintiff to proceed with the Physical Capacity Profile ("PCP") test.

Nurse Gordon Simpson administered the PCP test.  Before the test, plaintiff reported two prior neck fusion surgeries and a hernia surgery in the early 1990s.  (Def.'s Ex. 3 at p. 7).  Plaintiff denied further neck and back pain.  (*Id.*).  Plaintiff also signed a Physical Capacity Profile Informed Consent in which he agreed to stop the evaluation if he suffered any pain and to inform the administrator of any pain.  (*Id.* at p. 10).  Simpson reviewed this form with plaintiff before the evaluation.  (Dep. of Gordon Simpson at p. 14).  In the Physical Capacity Profile,  signed by plaintiff,  he checked the "N" next to neck pain, low back pain and current back pain.  (Def.'s Ex. 3  at p. 9).  As noted above, plaintiff complained of no pain.  Plaintiff testified that he hid any pain from Simpson, that he lied to Simpson and that he was embarrassed about the lying.   Simpson

noticed no pain on the part of plaintiff during the evaluation.  (Dep. of Gordon Simpson at p. 49).

The PCP test revealed that plaintiff can perform at a heavy work level.  He performed within acceptable limits on the strength and ability tests, including the range of motion test.  He performed squats, leg lifts and torso lifts[4] and  also lifted 70 pounds during the PILE test.[5]  (Def.'s Ex. 3 at p. 8).  Plaintiff passed the PCP test with a ranking of 4.34 out of 5.  (*Id.* at p. 6).

Plaintiff returned to work at Marquette for approximately 33 or 34 days with no complaints of pain or injury.  Plaintiff admitted that if he felt pain, he hid it from Marquette.  Plaintiff testified that his condition then deteriorated.  He became weaker and weaker, experiencing pain in his ribs, neck, stomach and feet.  He had difficulty sleeping and could not lift anything.  Plaintiff then quit his job at Marquette and never informed Marquette as to why he was quitting.

Plaintiff has a mortgage note on his home in the amount of $1126.12/month.  He has a car note in the amount of $565.00/month and a motorcycle note in the amount of $570.00/month.  Plaintiff's other monthly bills are: (1) car and house insurance: $210.00/month; (2)utilities: $350.00/month: (3) gasoline: $350.00-$400.00/month; and (4) groceries: $700.00/$800.00.  Plaintiff sold a boat and a truck to make ends meet.

Plaintiff admitted that he did not return to see a doctor at West Jefferson and saw no other physician after the May 1, 2010 West Jefferson visit until July 23, 2010.  On that date,

---

[4]     Plaintiff performed torso lifts at a resistance of 131.69 pounds, leg lifts at a resistance of 210.97 pounds and 13 squat repetitions.  (Def.'s Ex. 3 at p. 8).  Working at a heavy work level means that plaintiff can exert 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently and/or 10 to 20 pounds of force constantly.  (*Id.* at p. 6).

[5]     During a PILE test, a person lifts 20 pounds of weight in a receptacle from the floor to the person's waist four times within 20 seconds.  Weight is then increased in 10-pound increments, and the test is repeated.  (Def.'s Ex. 9).

approximately two months after plaintiff passed the PCP test, plaintiff saw Dr. Lucien Miranne. (Dep. of Dr. Lucien Miranne at p. 8). Miranne testified that as plaintiff's rib healed, plaintiff became more cognizant of the pain in his neck and back. (*Id.* at p. 9). At the examination, Miranne diagnosed a cervical spine injury and a possible cord compression because of a Lhermitte's sign. (*Id.* at p. 11).[6]

On August 11, 2010, plaintiff again saw Miranne. (*Id.* at p. 14). At that examination, plaintiff had a positive Spurling's test and a positive Lhermitte's sign.[7] An EMG that Miranne reviewed revealed a C6 nerve root impingement in the neck and an L5 nerve root finding consistent with a narrowed L4-5 disc. (*Id.* at pp. 22-23). Miranne recommend an anterior cervical fusion of the C7-T1 level and a microdiscectomy for the disc herniation at the L4-5 level. (*Id.* at pp. 25-26, 28-29).

Miranne testified that given plaintiff's size, plaintiff could "probably grit his teeth together" and pass the PCP test without demonstrating any pain. (*Id.* at p. 33). Miranne testified that plaintiff's strength was normal during all of the examinations. (*Id.* at p. 50). Miranne testified that plaintiff does not have the "moxie" or the "knowledge" to fake his symptomatology, (*Id.* at p. 90), but also testified that plaintiff could "fake" his way through his injuries and "grit his teeth" to exhibit no signs of pain during the PCP test. (*Id.* at 53, 33).

Magnolia Fleet first learned of plaintiff's injuries on August 11, 2010, when plaintiff served it with his complaint. When Weidner and Stewart learned that plaintiff had passed the PCP test and worked at Marquette following his termination from Magnolia Fleet, they denied his request for

---

[6] A Lhermitte's sign is an objective test that indicates positive or negative cord compression.

[7] A Spurling's test indicates foramen closure.

maintenance and cure.

At defendant's request, Dr. Christopher Cenac performed an independent medical evaluation on plaintiff on October 27, 2010. (Dep. of Dr. Christopher Cenac at p. 11-12). Cenac testified that plaintiff could not have performed the PCP test to the extent that he did or return to work as a captain for almost two and a half months had plaintiff's injuries been traumatically induced. (*Id.* at pp. 27-36). Cenac testified that plaintiff's injuries are degenerative in nature and that plaintiff did not undergo a major traumatic event on May 1, 2010. (*Id.* at 45, 59). Cenac opined that plaintiff's intent to return to work, the lack of documented complaints of pain, the lack of treatment and medication, and that plaintiff was not seeing a physician were all indicators that plaintiff had reached maximum medical improvement on May 20, 2010. (*Id.* at 22).

Cenac also testified that plaintiff "exhibited a vast amount of pain for having minimal overall findings . . . ." (*Id.* at p. 98). In Cenac's opinion, the pain exhibited by plaintiff during his examination by Cenac was "typical of someone overmagnifying and overstating his problems; and trying to get you, as a doctor, to see he's in a severe amount of pain; or trying to exhibit that." (*Id.* at p. 49).

Dr. Paul Hubbell owns IMS, where plaintiff underwent the PCP test. Hubbell testified that the PCP test would have elicited pain from someone who had a fractured rib. (Dep. of Paul Hubbell at p. 72). Hubbell opined that 90 per cent of patients with a symptomatic herniated disc could not lift 70 pounds during the PILE test without complaining of pain. (*Id.* at p. 75).

## III.   Conclusions of Law

Maintenance and cure benefits for which a shipowner is liable are designed to provide seamen with food and lodging when they become sick or injured in the ship's services. *Vaughn v.*

*Atkinson,* 369 U.S. 527 (1962); 2 Norris, The Law of Seamen § 542 (3d ed. 1970).  Maintenance and cure are maritime terms describing a seaman's right to receive food and lodging (maintenance) and necessary medical services (cure).  *E.g., Davis v. Odeco, Inc.*, 18 F.3d 1237, 1245 (5th Cir. 1994). When a seaman becomes ill or injured while in the service of his ship, the shipowner must pay him maintenance and cure, whether or not the shipowner was at fault or the ship unseaworthy. This obligation includes paying a subsistence allowance, reimbursing medical expenses actually incurred, and taking all reasonable steps to ensure that the seaman receives proper care and treatment.  Maintenance and cure is the implied contractual right of a seaman who is injured in the service of the ship, regardless of fault, to payments from the shipowner through the time of maximum recovery.  The shipowner's obligation to pay maintenance and cure to an injured seaman is not based on fault but results from the relationship of ship and seaman.  *Isthmian Lines, Inc. v. Haire*, 334 F.2d 521 (5th Cir. 1964); *Solet v. M/V Capt. H.V. Dufrene*, 303 F. Supp. 980 (E.D. La. 1969); 2 M. Norris, *supra*, § 547; *see also Adams v. Texaco, Inc.*, 640 F.2d 618, 620 (5th Cir. 1981) ("The shipowner's obligation to pay maintenance and cure . . . is not based on fault but results from the relationship of ship and seaman." (citation omitted)).

Hornbook law characterizes and delimits maintenance and cure as follows: "Maintenance and cure – a right given by the general maritime law in consequence of the seaman's status resulting from any shipping contract between the seaman and the master of the vessel – gives to the seaman, ill or injured in the service of the ship without willful misbehavior on his part, wages to the end of the voyage and subsistence, lodging and care to the point where the maximum cure attainable has been reached." *See* Martin J. Norris, The Law of Seamen, § 26:2 (4th ed.1985).  Suffice it to say, payments of advanced wages covering periods beyond the voyage and for temporary disability do

not come under the aegis of the shipowner's obligation to pay "maintenance and cure."

Before plaintiff can recover maintenance and cure, he bears the burden of alleging and proving the following facts: (a) his engagement as a seaman, (b) that his illness or injury occurred, was aggravated or manifested itself while in the ship's service, (c) the wages to which he may be entitled, and (d) the expenditures or liability incurred by him for medicines, nursing care, board and lodging. *Foster, III v. Brian's Trans. Serv.*, Civ. A. No. 91-4421, 1993 WL 114528,*2 (E.D. La. 1993) (citing Martin Norris, 2 The Law of Seamen § 26.21, at 53 (Supp. 1992)). However, this burden of proof is light, and the Court resolves ambiguities and doubts in the seaman's favor. *See id.* (citing *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962)).

Seamen injured in the course of their employment are entitled maintenance and cure benefits until they reach the point of maximum cure. *See Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987). Maximum cure is the point at which no further improvement in the seaman's medical condition is reasonably expected. *Lauland v. Hugh Eymard Towing Co., Inc.*, No. Civ. A. 99-652, 2000 WL 533880,*7 (citing *Farrell v. United States*, 336 U.S. 511, 518 (1949)). Generally, the obligation to provide maintenance and cure ends when a doctor provides a qualified medical opinion that plaintiff has reached maximum possible cure. *See id.* (citing *Breese*, 823 F .2d at 104-05).

A Jones Act employer is entitled to investigate a seaman's claim for maintenance and cure benefits. *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987). An employer is allowed to rely on certain legal defenses to deny these claims. *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968).

Plaintiff contends that he is entitled to maintenance and cure because the neck and back injuries that he sustained and the neck and back pain that he now experiences are the result of the

May 1, 2010 accident.  Magnolia Fleet contends that plaintiff did not sustain his back, neck and hernia injuries during his service on the Lockmaster.  Defendant notes that the West Jefferson examination revealed no such injuries.  Neither did plaintiff mention such injuries to Magnolia Fleet or its employees.  Defendant contends that even Miranne "begrudgingly" admitted that plaintiff's return to work for Marquette would be evidence that any injury that plaintiff had received during the fall would have resolved itself before Miranne treated plaintiff.

Defendant also contends that even had plaintiff received his injuries while working for it, the Court should bar him from receiving maintenance and cure because of his willful misconduct in fraudulently concealing his pain and injuries from defendant and for violating defendant's injury-reporting policy.  Defendant notes that plaintiff has twice before received maintenance and cure following injuries – in 1991 and 1994 – and thus plaintiff is familiar with the remedy.  Plaintiff should have known to report his injuries immediately.

Defendant also argues that plaintiff's three-month long concealment of his injuries has denied it the opportunity to have him treated before the injuries worsened to the point of requiring surgery.  Defendant contends that this also constitutes willful conduct.

If the Court determines that plaintiff is entitled to maintenance and cure, defendant first argues that he is entitled to none while he worked for Marquette.  Citing case law, defendant argues that when a seaman is fit enough to return to work by his own choice, he is not entitled to maintenance and cure.  Second, defendant contends that it acted reasonably in denying plaintiff maintenance and cure.  Defendant argues that it is entitled to investigate a claim for maintenance and cure and require corroboration before making payments.  Defendant argues that it has not shown callousness and indifference to plaintiff's injuries so as to warrant punitive damages and attorneys'

fees.  Defendant notes that it immediately began investigating the claim once it learned of plaintiff's injuries.

The Court finds that plaintiff is not entitled to maintenance and cure from defendant Magnolia Fleet because the injuries that he sustained during the May 1, 2010 fall are not the cause of the neck and back pain that plaintiff experiences now.  The parties do not contest that plaintiff fell in the water between the deck barge and the Lockmaster on May 1, 2010, and the Court finds ample evidence in the record of the fall, not the least of which is the medical records from West Jefferson.

However, the Court finds that any neck and back pain that plaintiff now experiences is not the result of that fall.  There was ample testimony from the witnesses at trial that plaintiff never complained of any pain to them during the 12 further days that plaintiff worked for Magnolia Fleet.  Plaintiff then passed the PCP test, with a rating of 4.34 out of 5.  During the PCP test, plaintiff never exhibited any sign of pain.  As noted above, plaintiff performed, *inter alia*, torso lifts at a resistance of 131.69 pounds, leg lifts at a resistance of 210.97 pounds and 13 squat repetitions.  (Def.'s Ex. 3 at p. 8).  Simpson cleared plaintiff to heavy work, which means that plaintiff can exert 50 to 100 pounds of force occasionally, and or 25 to 50 pounds of force frequently and/or 10 to 20 pounds of force constantly.  (*Id.* at p. 6).  The Court places great weight on the testimony of the two registered nurses who performed the physical examination of plaintiff and who administered the PCP test.  Neither testified that plaintiff had any physical limitations, and neither testified that plaintiff exhibited any pain during the examination or the PCP test.

Moreover, there was ample, credible testimony that plaintiff performed the duties of his job after the accident the same as he had performed them before the accident.  No witness testified that

16

plaintiff had difficulty getting onto or exiting the vessels, and the deck hand, Jeffrey Ricketts, and the other Captain, Joey Dufrene, testified that plaintiff "walked pretty good." Indeed, plaintiff's voluntary return to work for Magnolia Fleet and then for Marquette weighs against a finding of maintenance and cure. The Fifth Circuit has reversed a district court's grant of maintenance and cure when the plaintiff fails to demand maintenance and cure and voluntarily returns to work. *Dowdle v. Offshore Express, Inc.*, 809 F.2d 259, 266 (5th Cir. 1987). While the Court recognizes that plaintiff worked less than the plaintiff in *Dowdle*, the Court finds that *Dowdle* supports its finding here as plaintiff never asked for and was thus not denied maintenance and cure, and plaintiff voluntarily returned to work at Magnolia Fleet for approximately 12 days and at Marquette for approximately 33 days.

The Court also places great weight on the lack of medical attention for approximately two months after the accident. There was no evidence that plaintiff sought medical attention during his 12 days of employment at Magnolia Fleet after the accident or during his employment at Marquette. Plaintiff recognized that he never sought medical treatment for pain and even his wife testified that she never encouraged him to see a doctor. This is inconsistent with the amount of pain that plaintiff claims to have suffered.

In addition, the Court takes issue with the credibility of plaintiff. In contending that he demonstrated pain during the PCP test, plaintiff freely admitted that he lied to the nurse when he concealed the pain. Indeed, the Court notes that when plaintiff filled out the form before the PCP test, he checked "no" next to neck pain, low back pain and hernia pain. Plaintiff signed a form that instructed him to notify the nurse during the PCP test that he was experiencing pain. Plaintiff never did and cast into doubt his own credibility when he freely admitted this at trial.

Further, that plaintiff never complained of pain to anyone at Magnolia Fleet damages his credibility.  As plaintiff claimed to have had pain during his 12 days of employment at Magnolia Fleet after the accident, but concealed it, plaintiff basically affirms that he can hide the truth when necessary.  In addition, Cenac questioned the veracity of plaintiff's complaints of pain during his examination of plaintiff.  (Dep. of Dr. Christopher Cenac at pp. 45, 69, 98).  Even Miranne admitted that plaintiff could have "faked" his way through the PCP test, thus admitting that plaintiff has the ability to conceal the truth when necessary.  (Dep. of Dr. Lucien Miranne at p. 33, 53).   Indeed, Miranne admitted that plaintiff could have been faking his pain during Miranne's examination.  (*Id.* at p. 54).

The Court finds that the great weight of the medical testimony also supports its finding here. As to plaintiff's ventral hernia, Dr. Joseph Uddo testified that the aging process, the lifting of a heavy object, sneezing and even heavy coughing can cause a ventral hernia.  (Dep. of Dr. Joseph Uddo at pp.18-19).  Uddo also testified that, in his opinion, had the trauma – plaintiff's fall – induced the hernia, plaintiff would have suffered pain simultaneous to the trauma.  (*Id.* at pp. 19-20).  But, as noted above, plaintiff never complained of pain following the fall or even during the PCP test. Plaintiff complained of no abdominal pain at West Jefferson that would indicate the traumatic inception of a ventral hernia.  (*Id.* at pp. 21-22; Def.'s Ex. 1).  The physical examination of plaintiff by Zeringue and at the request of Marquette revealed no ventral hernia.  (Dep. of Beth Zeringue at pp. 24-27).  And Uddo explicitly testified that performing the PCP test would have caused plaintiff pain if he had had a ventral hernia at that time.  (Dep. of Dr. Jospeh Uddo at pp. 31-31).  As noted repeatedly above, however, plaintiff never complained of pain during the PCP test.

Moreover, and as noted above, Cenac testified that plaintiff could not have performed the

PCP test to the extent that he did or return to work as a captain for almost two and a half months had plaintiff's injuries been traumatically induced.  (*Id.* at pp. 27-36).  Cenac testified that plaintiff's injuries are degenerative in nature and that plaintiff did not undergo a major traumatic event on May 1, 2010.  (*Id.* at 45, 59).  Cenac opined that plaintiff's intent to return to work, the lack of documented complaints of pain, the lack of treatment and medication, and that plaintiff was not seeing a physician were all indicators that plaintiff had reached maximum medical improvement on May 20, 2010.  (*Id.* at 22).[8]  There was no evidence introduced at trial that plaintiff took any muscle relaxers, anti-inflammatories or neurogenic medicines, or that he had any physical therapy, chiropractic treatments or pain management after the May 1, 2010 accident and before his visit to Miranne on July 23, 2010.

Even Miranne admitted that plaintiff could have recovered from the May 1, 2010 accident sufficiently to return to work and to pass the PCP test and that something else might have happened near the end of July 2010 that caused  plaintiff's pain.  (Dep. of Dr. Lucien Miranne at pp. 91-92). The Court also recognizes that even Miranne, the treating physician, equivocated as to the extent and cause of plaintiff's pain.  For example, Miranne admitted that it  was "possible" that plaintiff did not have the symptoms as to which Miranne opined if plaintiff had exhibited no pain during the PCP test.  (*Id.* at p. 56).  In addition, Miranne testified that plaintiff would have exhibited neck and back pain after the fall and during the West Jefferson examination (*id.* at p. 58), even though plaintiff did not.  (Def.'s Ex. 1).  Miranne admitted that a return to work would be a positive sign that someone

---

[8]     While plaintiff may have been entitled to maintenance and cure following the May 1, 2010 accident until May 20, 2010, the date on which Cenac testified that plaintiff had reached maximum medical improvement, the Court notes that plaintiff never demanded maintenance and cure from Magnolia Fleet at that time and voluntarily returned to work first for Magnolia Fleet and then for Marquette. *See Dowdle*, 809 F.2d at 266.

has healed from any aggravated degenerative changes. (*Id.* at p. 64). Miranne further admitted that plaintiff's back symptoms could be related to plaintiff's prior cervical fusion and not the May 1, 2010 accident. (*Id.* at p. 66).

While the Court recognizes that, at one point in the deposition, Miranne agreed with plaintiff's counsel that plaintiff's pain and injuries were related to the May 1, 2010 accident, the Court finds that the overwhelming weight of the evidence is to the contrary. The absence of any mention of pain for almost three months to his employer or any health care provider, the West Jefferson medical records, the results of the PCP test, plaintiff's repeated false statements to health care providers and plaintiff's threats to defendant of reprisals for his firing all weigh in favor of a finding that plaintiff is not entitled to the benefits that he seeks.

During the trial, plaintiff concentrated on the fact that defendant failed to adhere to its own policies after the accident by not testing plaintiff for alcohol or drugs, by allowing plaintiff to return to work before he received a release form, and by not reporting a "significant marine injury." The relevant fact is that plaintiff never reported any pain to anyone at Magnolia Fleet and thus never gave Magnolia Fleet the opportunity to provide him with the proper medical services.

## IV. Conclusion

For the foregoing reasons, the Court finds that the great weight of the evidence introduced at trial leads to the conclusion that no compensable back or neck injury occurred, was aggravated by or manifested itself while plaintiff was in the service of defendant Magnolia Fleet's vessel. Accordingly, plaintiff is not entitled to maintenance and cure from defendant Magnolia Fleet.

New Orleans, Louisiana this 25th day of February, 2011.

20

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**